## APPEAL OF JOHN A. McCANDLESS.

Docket No. 2784. Promulgated January 20, 1927.

Upon the evidence, *held*, that a transfer of shares of stock by the taxpayer did not constitute a sale and that no deductible loss resulted therefrom; also, that the fixing of a fraud penalty of 50 per centum of the total amount of the deficiency, resulting from the disallowance of the deduction sought, was proper.

*Urban E. Wild, Esq., Arthur S. Hoppe, Esq., E. R. Cameron, C. P. A.,* and *A. R. Bechtold, C. P. A.,* for the petitioner.

*A. Calder Mackey, Esq., Ward Loveless, Esq., John D. Foley, Esq.,* and *W. Frank Gibbs, Esq.,* for the Commissioner.

This appeal is from the determination of a deficiency in income tax in the amount of $9,216.84 for the year 1921, and an added fraud penalty of $4,608.42, or a total deficiency of $13,825.26.

### FINDINGS OF FACT.

1. The taxpayer is a citizen of the United States and a resident of Honolulu, T. H.

2. The California-Hawaiian Development Co. is a corporation which was organized under the laws of the State of California on or about September 27, 1911. This company, hereinafter called the corporation, was organized by the taxpayer and several associates, among whom was C. G. Bockus, for the purpose of acquiring from the Sierra Nevada Development Co., an Arizona corporation, certain mining properties located in Placer County, California. The corporation was incorporated with a capital stock of 3,000,000 shares having a par value of one dollar each. Sometime in 1909 the taxpayer had purchased shares of stock in the Sierra Nevada Development Co. at the price of $7.50 for shares having a par value of $10

each. These shares were exchanged in 1911 for shares of stock in the corporation at the ratio of one for twenty, thus making the cost to the taxpayer of such shares in the corporation 37½ cents each.

3. C. G. Bockus was a resident of Honolulu for many years prior to March, 1922, when he left Honolulu for San Francisco, Calif., where he has since continued to reside. He had been one of the organizers and for some time the secretary of the corporation, and was a licensed dealer in stocks, bonds and general securities in the Territory of Hawaii during the year in question. He was on terms of intimate friendship and association with the taxpayer and had many business dealings in the sale and purchase of stocks and bonds for him.

4. On or about December 10, 1921, Bockus called at the office of the taxpayer in Honolulu and stated that he desired to purchase some of the taxpayer's shares in the corporation. At that time the taxpayer told Bockus he would consider the offer. A few days later Bockus again called on the taxpayer without any resulting arrangement. On or about December 21, Bockus made another visit to the taxpayer's office. At that time the taxpayer produced certificate 95 for 267,780 shares of the stock of the corporation. The certificate was then endorsed by the taxpayer and delivered to Bockus, who, at the same time, gave to the taxpayer his demand promissory note for the sum of $13,389. Bockus took the stock away with him and within the next few days mailed it to the office of the corporation in San Francisco, where, on December 30, 1921, it was canceled and certificate 696, for the same number of shares, was issued in lieu thereof in the name of C. G. Bockus. This certificate was mailed to Bockus and received by him at Honolulu. Bockus held certificate 696 in his possession until May, 1922. The taxpayer paid for the documentary stamps on the promissory note given to him by Bockus and also on the stock certificate delivered by him to Bockus. Previous to December 10, 1921, the taxpayer had endeavored to sell some of his shares of stock in the corporation to other brokers, but did not so dispose of any of his stock. At the time of the transfer of certificate 95 on December 21, 1921, the taxpayer paid $267 to Bockus as a part of a brokerage commission on the transfer and, in February, 1922, paid him an additional amount of $1,000 as the balance due on such commission. This transfer of stock to Bockus for a promissory note, which the taxpayer claims was a sale, was made because he desired to sustain a loss for the purpose of deducting the amount thereof from his income in his tax return for 1921.

5. The shares of stock transferred by the taxpayer to Bockus were acquired by him November 14, 1911, in exchange for the shares of stock of the Sierra Nevada Development Co. which he then owned.

At the ratio of exchange, the cost to the taxpayer of the shares represented by certificate 95 was 37½ cents per share. During the period from December 26, 1914, to June 28, 1921, the taxpayer paid assessments amounting to 11 cents per share, thus making the total cost of each share 48½ cents, or $129,873.30 for the 267,780 shares. The fair market value of the stock on March 1, 1913, was 50 cents per share.

6. In his income-tax return for the year 1921, the taxpayer claimed a loss of $116,484.30 on the transfer to Bockus of the 267,780 shares of stock of the corporation and sought therein to take a deduction of that amount as a loss on such transfer on the assertion that it was a sale. The Commissioner disallowed the deduction sought, asserted that the alleged sale was false and fictitious, determined a deficiency in the amount of $9,216.84, and added a fraud penalty of $4,608.42.

7. In the latter part of May, 1922, the taxpayer called on Bockus at his office in San Francisco and inquired of him as to whether he could pay the promissory note for $13,389. Bockus replied that he could not and requested the taxpayer to take back the stock in exchange for the note. In response to this request the taxpayer delivered the note to Bockus, who tore it up. Bockus then endorsed certificate 696 and immediately delivered it to the taxpayer. This certificate was canceled June 9, 1922, and certificates 703 and 704 were issued to the taxpayer in lieu thereof. On this return transfer the taxpayer paid Bockus another brokerage commission amounting to $1,267.

8. Sometime in November, 1922, Bockus and the taxpayer had a conversation in San Francisco in which Bockus informed the taxpayer that he was heavily involved financially and that there was likelihood of bankruptcy proceedings being instituted against him by his creditors. The taxpayer expressed his willingness to assist Bockus and offered to sell him some stock in the corporation after the bankruptcy petition had been filed, in order to give Bockus an opportunity to make some money by reselling the stock. The taxpayer was to make no final decision until he returned to Honolulu. His return to that city followed within the next week or two. The creditors of Bockus filed a petition in involuntary bankruptcy against him on December 7, 1922, and, on December 28 he was adjudged a bankrupt. Prior to the latter date and after December 7, the taxpayer mailed certificates 126, 197, 324, 350 and 409 for a total of 152,736 shares of stock in the corporation, which stood in his name on the books of the corporation, to H. A. Kunz, secretary, at San Francisco. These certificates were accompanied by written

instructions from the taxpayer for Kunz to issue a certificate for the 152,736 shares to Bockus and take in return therefor Bockus' promissory note for the amount of $3,054.72. At the same time the taxpayer wrote to Bockus informing him of the instructions to Kunz. Bockus executed his demand promissory note for $3,054.72, delivered it to Kunz and, on December 27, 1922, Kunz issued certificate 713 in Bockus' name for the 152,736 shares and delivered it to him. In November, 1923, Bockus told the taxpayer that he had not sold the stock and was unable to pay the promissory note. The taxpayer then informed Bockus that sufficient opportunity to sell the stock had been given him and stated that he, the taxpayer, desired to repurchase the stock by cancellation of the note. Certificate 713 was endorsed by Bockus and returned to the taxpayer. A brokerage commission of $230 was paid to Bockus by the taxpayer on each of these stock transfers. In his income-tax return for the year 1922, the taxpayer claimed a loss of $54,984.96 on the transfer of the 152,736 shares of stock to Bockus in December, 1922, and deducted that amount as a loss.

9. The taxpayer purchased no shares of the stock of the corporation within sixty days prior or subsequent to the transfer of the 267,780 shares of stock of the corporation described in paragraph 5.

10. The transfer to Bockus of the 267,780 shares of stock of the corporation was made with intent to evade tax, and the return of the amount of $116,484.30 by the taxpayer as a loss resulting from a sale was false and fraudulent.

OPINION.

TRAMMELL: The sole question for consideration is whether the attempt by the taxpayer to deduct a loss of $116,484.30 in his income-tax return for 1921 was a fraud with intent to evade tax. The Commissioner asserts that the transaction upon which the deduction was predicated was a pretended sale, designed to effect an evasion of taxation. The taxpayer admits that the transfer described in paragraph 4 of the findings was made in order that he might deduct a loss for the taxable year. If the transaction was a sale, the taxpayer's admission expresses a perfectly legal intent. *United States* v. *Isham*, 17 Wall. 496; *Appeal of Pennsylvania Co. for Insurance, etc.*, 2 B. T. A. 48; *Appeal of Benjamin T. Britt*, 2 B. T. A. 53; *Appeal of Harold B. Clark*, 2 B. T. A. 555. Whether the proper intent existed in the present case remains to be determined from the circumstances surrounding the transaction.

The evidence discloses a tangled web of circumstances from which it is difficult to unravel the threads of truth. From a brief narrative

of what at first appears to be an actual sale of shares of stock, the testimony, in its extended detail, presents confusion and suspicion.

Bockus and the taxpayer testify with positiveness that, on or about December 10, 1921, Bockus called on the taxpayer and told him that he wanted to buy some of the corporation stock; that a few days subsequently there was another conversation about the matter, and that on December 21, 1921, the negotiations were closed by the taxpayer selling to Bockus certificate 95 for 267,780 shares of the stock and taking in payment therefor Bockus' demand promissory note for $13,389. Both witnesses testified that this transaction was a sale and was intended by both to be a sale. In corroboration it was shown that certificate 95 was surrendered by Bockus and canceled on the books of the corporation; that certificate 696 was issued to Bockus in lieu thereof and retained by him for some four or five months. These, in brief, are the facts upon which the taxpayer relies to support his right to a deduction of a loss and to defeat the deficiency and added penalty.

According to Bockus, his offer to purchase was made on his own behalf and he was not acting as a broker, but as a principal, in making the purchase. Yet we find him charging, and the taxpayer paying in cash, a brokerage commission of $1,267 on a sale which involved Bockus giving a note of somewhat doubtful value in payment for the shares of stock. Bockus testified that this commission was justified by custom, yet, when pressed on cross examination, he admitted that in all his dealings he had never before received a commission for giving a note for stock which he purchased for his own use and benefit. To further aid in making the sale, the taxpayer, in addition to paying for the revenue stamps on the transfer of the shares to Bockus, paid for the stamps on the note given him by Bockus, despite the fact that Bockus was to receive a rather liberal commission on the deal. Apparently the taxpayer was not only desirous of making a sale, but was extremely anxious to facilitate it for the purpose of taking a loss within the year in issue.

Bockus held certificate 696 until the latter part of May, 1922, or approximately two and a half months after the taxpayer was required to file the income-tax return for 1921 in which he had deducted a loss of $116,484.30 on the purported sale. There is no testimony to show that Bockus made any attempt to dispose of it by sale during the period of his possession and thus realize a profit, though he testified that his reason for purchasing the stock was to make a profit on resale. When the taxpayer called on Bockus in the latter part of May, 1922, and inquired as to whether he could pay the note and Bockus requested the taxpayer to repurchase the stock

by giving him back his note, the taxpayer was peculiarly prompt in acquiescing and obviously generous in paying Bockus a commission to sell back the stock to him in consideration for a note which was apparently worthless. In the sale and repurchase of the stock, the taxpayer paid commissions amounting to $2,534. For these payments he had the stock restored to his possession, but had claimed a deduction in his income-tax return which had saved him from the payment of a tax of $9,216.84. These circumstances are such as to throw strong suspicion upon the *bona fides* of the transaction of December 21, 1921.

This suspicion is augmented when we consider the further transactions between the taxpayer and Bockus. In November of 1922, about six months after Bockus had declared himself unable to pay his note of December 21, 1921, and in the face of confession by him of impending bankruptcy proceedings, the taxpayer again discussed another sale of corporation stock to Bockus. Immediately following the filing of the creditors' petition in involuntary bankruptcy against Bockus, the taxpayer in Honolulu mailed certificates representing 152,736 shares of the corporation stock to San Francisco to be delivered to Bockus upon his executing and delivering a promissory note in the amount of $3,054.72, at the rate of 2 cents per share, in favor of the taxpayer. This note was delivered to the taxpayer's agent on December 27, 1922, just before the close of the taxable year, and the taxpayer in his income-tax return deducted a loss of $54,984.96 on the purported sale. Again we find Bockus retaining the stock, again we find him unable to pay his note, once more we find the taxpayer willing to repurchase the stock, after the filing of his return by returning Bockus' promissory note, and again we find that the taxpayer has paid Bockus a commission on each of the so-called sales.

From the testimony of the taxpayer and Bockus we are of the opinion that the transfer of stock to Bockus in December 21, 1921, was not a sale, that it was a mere pretense to permit the taxpayer to claim a loss, and that the return was false and wilfully so made.

*Judgment will be entered on 30 days' notice, under Rule 50.*

MILLIKEN did not participate.

MURDOCK dissents.

PHILLIPS, concurring: The record before us in this proceeding, unlike the two appeals of taxpayer's brothers, which were heard at the same time, is, in my opinion, sufficient to establish the crime charged beyond any reasonable doubt. I therefore concur in the result which has been reached.